Virginia GAITHER (Administratrix and Personal Representative of the Estate of Lebron Gaither, Deceased), Appellant

v.

JUSTICE & PUBLIC SAFETY CABINET, Commonwealth of Kentucky; Department of Kentucky State Police; and Board of Claims, Appellees

Justice & Public Safety Cabinet, Commonwealth of Kentucky and Department of Kentucky State Police, Cross–Appellants

v.

Virginia Gaither (Administratrix and Personal Representative of the Estate of Lebron Gaither, Deceased) and Kentucky Board of Claims, Commonwealth of Kentucky, Cross–Appellees.

Nos. 2012–SC–000324–DG, 2012–SC–000835–DG.

Supreme Court of Kentucky.

Aug. 21, 2014.

As Corrected Sept. 15, 2014.

Rehearing Denied Dec. 18, 2014.

Daniel T. Taylor, III, Philip Clyde Kimball, Counsel for Appellant/Cross–Appellees.

Lyndol Scott Miller, Christian M. Feltner, Counsel for Appellees/Cross–Appellants Justice & Public Safety Cabinet, Commonwealth of Kentucky and Department of Kentucky State Police.

George Mitchell Mattingly, Counsel for Appellee Board of Claims.

Opinion of the Court by Justice VENTERS.

The Board of Claims (the Board) awarded the sum of $168,729.90 to Appellant, Virginia Gaither, Administratrix of the Estate of Lebron Gaither[1] upon its conclusion that Lebron Gaither's death, which occurred while he was working as a confidential informant for the Kentucky State Police (KSP), was caused by the negligent performance of ministerial acts by state

1. For clarity we refer to Appellant, Virginia Gaither, Administratrix of the Estate of Lebron Gaither, as "the Estate;" and to the decedent, Lebron Gaither, as "Gaither."

police officers acting within the scope of their employment. The Franklin Circuit Court reversed the decision of the Board, holding that the actions of the state police officers that led to Lebron's death were discretionary acts, not ministerial acts, and therefore were subject to the doctrine of sovereign immunity. The Court of Appeals affirmed.

The Estate sought discretionary review. Appellee, Commonwealth of Kentucky, Justice and Public Safety Cabinet (the Cabinet), which oversees the Department of the Kentucky State Police, filed a cross-motion for discretionary review to preserve issues presented to, but not addressed by, the Court of Appeals. Because we conclude that the acts involved here were, as the Board of Claims concluded, ministerial acts, we reverse the Court of Appeals. We also remand the matter to the Board of Claims for a correction of its calculation of the amount of the award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lebron Gaither was a seventeen-year-old high school student facing assault charges arising from an altercation he had with a school administrator. To minimize his punishment for that offense and to earn some money, Gaither accepted an offer extended by the KSP to act as a confidential informant assisting in their investigation of illegal drug trafficking in Marion and Taylor Counties. Under the applicable protocol,[2] without the consent of his parent or a legal guardian, which they did not have at the time of the agreement, the KSP could not use Gaither as a confidential informant. However/ soon after his 18th birthday, Gaither began working under the direction of KSP Detective Danny Burton making controlled drug buys from suspected drug dealers. The Board of Claims described Gaither as "not sophisticated in law enforcement techniques or drug dealing," and as "relying on the KSP detectives, who directed his activities, to protect him, within reason."

In the usual situation, Detective Burton or another KSP investigator attached a hidden recording device to Gaither and sent him with cash to buy illegal drugs from individuals targeted by KSP investigators. After performing this service on several occasions over a period of six months, and earning more than $3,100.00, Gaither was taken by Detective Burton to testify before grand juries sitting in Taylor County and Marion County.

At each of Gaither's grand jury appearances, the KSP officers made no effort to conceal the fact that they were taking Gaither to appear as a witness for the Commonwealth. He was openly escorted into each courthouse by Detective Burton, and led in the company of police officers through crowded public corridors which, according to the Board of Claims, "were full of criminal defendants who were well-versed and sophisticated in the criminal on-goings in these two small counties ... clearly compromis[ing] [Gaither's] identity as an informant." Gaither was described as a distinctively large young man whose presence would be hard to overlook. He had not been subpoenaed by the grand jury in either county; instead, the unusual decision to bring a confidential informant personally to a grand jury was made by Detective Burton in conjunction with prosecuting attorneys. They did so out of concern that at a subsequent trial, Gaither might be pressured to recant or otherwise alter his recollection of his transactions with the indicted drug dealers. Testifying under oath before the grand juries would preserve his version of events, and prose-

---

2. *See* KSP General Order OM–C–3, page 4. (4–16–90)

cutors would thereby retain the leverage of a perjury charge to discourage Gaither from changing his testimony later on.

One of the suspects that Gaither implicated before the Taylor County Grand Jury was Jason Derek Noel. Unbeknownst to Gaither and his KSP handlers, a grand juror named Mary Ann Esarey was acquainted with Noel and she immediately disclosed to Noel that Gaither was the police informant giving testimony against him.[3]

The day after Gaither testified against Noel, in what might be fairly described as the height of imprudence, Burton and his fellow KSP Detectives, Tim Simpson and James Antle, decided to use Gaither in yet another drug buy from Noel. This time, however, the plan was to do a "buy/bust," meaning that instead of collecting evidence of a drug sale for a future arrest, the officers would listen to the transaction by way of a radio transmission and when the illegal deal was completed, they would immediately move in to arrest Noel on the spot.

Arrangements were made for Gaither to meet Noel on a grocery store parking lot in Campbellsville. Gaither was fitted with a recording device and radio transmitter which would enable officers to listen to the transaction as it occurred. He was given marked money to use to purchase drugs from Noel. The KSP detectives positioned themselves nearby in two inconspicuous vehicles. They explicitly instructed Gaither not to get into Noel's vehicle, and they provided Gaither with certain code words to use if he believed himself to be in danger. They assured him that they would intercede if things went wrong.

Almost immediately, after Noel arrived and engaged in conversation with Gaither, things began to go wrong. First, Gaither got into Noel's car. Second, Noel's car drove away. The officers did not hear Gaither utter the pre-arranged distress signal, so instead of interceding immediately to stop the car and arrest Noel, they elected to follow Noel's vehicle and to try to monitor the radio transmission. Eventually, Noel stopped the vehicle and entered a residence, leaving Gaither in the car. The police maneuvered to keep their own vehicles out of view, and again chose not to intercede. When they heard, via radio transmission, the engine of Noel's car start up and drive away, they were unable to see where it went. Consequently, they lost visual and radio contact with Gaither.

Finally, rather than immediately issuing an alert for other police agencies in the area to be on the lookout for Noel's car (and Gaither), the officers combed the area on their own, hoping without success to salvage the operation. Eventually, they gave up their own search and issued a call for help from other law enforcement agencies in finding Gaither and Noel's vehicle. Late that night, other local officers spotted Noel and his vehicle. They apprehended him only to learn that he had taken Gaither to adjoining Casey County to be tortured and killed.[4]

---

3. Esarey was eventually convicted of wanton endangerment in the first-degree, complicity to retaliating against a witness, and first-degree perjury for her role in Lebron's death. *Esarey v. Commonwealth,* 2001–CA–001153–MR, 2003 WL 22461276 (Ky.App. Oct. 31, 2003).

4. Noel was convicted in the Casey Circuit Court for the murder of Lebron Gaither. He was also convicted of first-degree robbery for taking the $400.00 in cash that the KSP provided to Lebron for the controlled drug buy. The convictions were affirmed by this Court. *Noel v. Commonwealth,* 1999–SC–0379–MR (rendered May 24, 2001). Noel was later convicted of trafficking in cocaine based upon the information collected by Lebron's work as a confidential informant. *Noel v. Common-*

The Estate filed a wrongful death claim against the Kentucky State Police, invoking the jurisdiction of the Board of Claims under KRS 44.073(2),[5] alleging Gaither's death was caused by Detective Burton and other KSP officers in the negligent performance of ministerial duties within the course and scope of their employment. Ultimately, the Board agreed and concluded that "detectives failed to use significant judgment; their conduct constituted the negligent performance of a series of ministerial duties." Specifically, the Board identified four instances of KSP conduct that it found to be the negligent performance of ministerial acts:

1. Disclosing Gaither's status as a confidential informant by escorting him to the grand juries through courthouse corridors crowded with persons involved in the illicit drug trade;

2. Disclosing Gaither's status as a confidential informant by having him testify before the grand juries in person instead of protecting his identity by offering his information through the hearsay testimony of a police officer;[6]

3. Failing to follow the ground rules they established for the buy/bust by not interceding when Gaither entered Noel's car; and

4. Failing to promptly report the loss of contact with Gaither by alerting other police agencies to be on the lookout for Gaither and the Noel vehicle.

Based upon that conclusion, and after apportioning fault for Gaither's death among the various parties involved, including Gaither himself, the Board awarded Gaither's estate $168,729.90.[7]

Upon review, the Franklin Circuit Court reversed the Board's decision, concluding that the KSP conduct that contributed to Gaither's death was not related to the performance of ministerial duties, but instead resulted from the performance of discretionary acts for which there has been no waiver of sovereign immunity.[8] The Estate appealed to the Court of Appeals, which affirmed the circuit court's reversal of the Board's opinion. We granted the Estate's motion for discretionary review and the Cabinet's cross-motion for discretionary review. Based upon the following analysis, we reverse the Court of Appeals.

*wealth,* 2001–CA–001107–MR, 2003 WL 2002803 (Ky.App. May 2, 2003).

**5.** KRS 44.073(2): "The Board of Claims shall have primary and exclusive jurisdiction over all negligence claims for the negligent performance of ministerial acts against the Commonwealth, any of its cabinets, departments, bureaus, or agencies, or any officers, agents, or employees thereof while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies."

**6.** The rule against admission of hearsay evidence does not apply in a grand jury proceeding. KRE 1101(d)(2).

**7.** The Board's apportioned fault for Gaither's death as follows: 50% to Noel; 30% to the KSP; 15% to Esarey; and 5% to Gaither. It found total damages to the estate to be $568,006.08. Its calculation of the final award is not readily understandable because 30% of $568,006.08 is $170,401.82, not $168,729.90. *See* Section III E of this opinion.

**8.** *See Collins v. Commonwealth of Ky. Natural Res. & Envtl. Prot. Cabinet,* 10 S.W.3d 122, 125 (Ky.1999) ("[KRS 44.070(3)] clearly establishes that any negligence claims against the Commonwealth or its subdivisions must be for the negligent performance of 'ministerial acts.' By implication, the negligent performance of nonministerial, i.e., discretionary, acts cannot be a basis for recovery under the Act.").

## II. USING GAITHER AS A CONFIDENTIAL INFORMANT AFTER HIS ANONYMITY HAD BEEN COMPROMISED WAS THE NEGLIGENT PERFORMANCE OF A MINISTERIAL ACT

The Commonwealth of Kentucky and its agencies, including the Kentucky State Police, are insulated against liability claims by sovereign immunity, a doctrine founded upon "the notion that the resources of the state, its income and property, cannot be compelled as recompense for state action that harms a plaintiff through the ordinary suit-at-law process." *Commonwealth v. Kentucky Ret. Sys.*, 396 S.W.3d 833, 836 (Ky.2013).

 Sovereign immunity, however, may be waived by the legislature, provided it does so "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Id.*[9] The Board of Claims Act, KRS 44.070 *et seq.*, provides a limited waiver for "negligence claims for the negligent performance of ministerial acts" by "any officers, agents, or employees" of the Commonwealth "while acting within the scope of their employment by the Commonwealth." KRS 44.073(2).[10]

 There is no dispute that all of the relevant conduct of the KSP officers under review was performed within the scope of their employment as state police officers. Thus, the Estate's ability to pursue a claim against the KSP for Gaither's wrongful death turns entirely upon whether any the KSP actions leading to Gaither's death were ministerial acts, or whether all of such actions were discretionary acts.

We have on several occasions described a ministerial act as "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky.2001). We have described discretionary acts as those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.

> It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.

*Haney v. Monsky,* 311 S.W.3d 235, 240 (Ky.2010) (citations omitted.)

In recent years, very little has been added to improve upon the explanation given more than 50 years ago by our predecessor court in *Upchurch v. Clinton Cnty.,* 330 S.W.2d 428, 430 (Ky.1959), and we find it worth repeating here:

> The essentials of a ministerial as contrasted with a discretionary act are thus set forth in 43 Am.Jur., Public Officers,

---

9. Ky. Const. § 231: "The General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth."

10. We recognize that the concept of "negligent performance of a ministerial act" as stated in the statute encompasses the negligent *failure to act,* or negligent omission of a min-isterial act. *See Marson v. Thomason,* 438 S.W.3d 292 (Ky.2012) (Petition for rehearing pending.) ("But if such an act is omitted, or performed negligently, then that governmental employee has no immunity, and can be sued individually for his failure to act, or negligence in acting that causes harm.")

sec. 258, p. 75: 'An official duty is ministerial when it is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts; that a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in its nature. Discretionary or judicial duties are such as necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed. However, an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means or method to be employed.

Although we ultimately disagree with the Court of Appeals' disposition of this case, we agree with several aspects of its critical analysis. Specifically, we agree that the decision to have Gaither testify before the grand juries of Taylor and Marion Counties was a discretionary matter. In hindsight, it may be easy to see that an alternative method could have been used to present his testimony while preserving his anonymity, but ultimately we recognize that deciding how to prepare and present a case in any tribunal, including a grand jury, requires the exercise of prosecutorial discretion and judgment. It is not a ministerial act, and the Court of Appeals's conclusion on that point was correct.

We also agree that the award could not be based upon the KSP's exposure of Gaither to the local criminal element by escorting him through crowded courthouse corridors. While simply delivering a confidential witness to the grand jury requires no significant degree of discretion or judgment, and would otherwise be regarded as a ministerial act, it is also apparent from facts in evidence that the negligence of walking Gaither through the crowded courthouse did not cause Noel to learn of Gaither's role as an informant, since we know now that he learned about it from Esarey; therefore, the promenade through the courthouses had no causal connection to Gaither's death.

We must also agree with the Court of Appeals that after the final buy/bust went awry, deciding whether to intercede immediately or to follow and watch for a better opportunity required the exercise of critical judgment. It is not immediately apparent that prudence mandated a prescribed "absolute, certain, and imperative" course of action. In that vein, the Court of Appeals correctly found that the officer's decision to forebear interceding when Gaither got into Noel's car was a discretionary act.

However, we do not agree with the Court of Appeals' characterization of the officers use of Gaither as an informant in a buy/bust *after* it became obvious that his anonymity as an informant was compromised. Even though the officers could not have known that Esarey would tip-off Noel about Gaither's undercover work, they could not have failed to know, after their open and obvious association with Gaither escorting him through the two courthouses and his appearances under his real name before two grand juries, that his identity as an informant was *no longer confidential* among the criminal element in each county.

The Board determined from the evidence that an "absolute, certain, imperative, and clear" standard of police work is to not use a confidential informant after

his identity has been compromised, and that retaliation against an informant whose anonymity has been disclosed is readily foreseeable. The Board concluded, "There is no discretion whether to use a burned informant again[11]. It is simply not done, particularly under this set of facts[.]"[12] That finding was based upon evidence from distinguished professionals experienced in the investigation and prosecution of drug cases and the use of confidential informants. From that evidence, the Board found that a known rule, a clear and certain imperative within the law enforcement professions, was that a confidential informant whose identity was compromised by his appearance in public with his police sponsors, and by his personal appearance under his own name before a grand jury, cannot be used in another buy/bust operation.

Central to the Court of Appeals' analysis was its view that in deciding whether to use Gaither for the final buy/bust with Noel, the KSP officers did not have the specific directives of a statute or an administrative regulation to follow, and thus their decision was not dictated by a "clearly defined duty to perform an act." The Court of Appeals examined the KSP's confidential informant protocol, General Order OM–C–3, and found that it did not establish with sufficient specificity a duty that would divest the detectives of their discretion in using Gaither as a grand jury witness or using him afterwards in the final buy/bust with Noel. We disagree with that conclusion because we have acknowledged that the duty compelling the performance of a ministerial act need not spring from a specific statute, administrative regulation,

or formal policy statement or protocol. There are instances in which ministerial actions may flow from common law duties or professional customs and practices. Our jurisprudence has taken note of such instances.

For example, in *Commonwealth, Transp. Cabinet, Dep't of Highways v. Sexton*, 256 S.W.3d 29, 33 (Ky.2008), we noted that "an act may be ministerial even if that act is not specifically covered by applicable statutes, or administrative regulations." We then cited this hypothetical instance as an example: "if a state entity has actual notice of the existence of a dead or dangerous tree on property owned by that state entity, inspecting or removing the tree may be a ministerial act." While there is no duty requiring state employees to inspect trees, a ministerial imperative would arise from the knowledge that the tree is dangerous and the common law duty of landowners with respect to latent hazards of which they have notice.

In *Haney v. Monskey*, 311 S.W.3d 235, 245 (Ky.2010), citing to *Sexton*, we said, "[b]ecause it is the nature of the duty that controls the analysis, we have also recognized that a common law duty—if specific and affirmative in its command—could render an act or function essentially ministerial in the absence of any statute or regulation on point."

Perhaps the clearest example of a ministerial act premised upon a duty that arose from custom and practice can be found in the landmark case of *Yanero*, 65 S.W.3d at 510, where we concluded that the failure of a high school baseball coach to require a player to wear a batting helmet during batting practice was a ministerial act, even

---

11. As noted by the Board, "burned" is a term used in law enforcement to describe an informant whose identity has been compromised or disclosed.

12. The Board quoted *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) for the fact that "[o]nce an informant is known, the drug traffickers are quick to retaliate."

though there was no established or written rule mandating the use of helmets.[13] In *Yanero,* we cited testimony establishing that despite the lack of a formal rule, all the participants in high school baseball, players and coaches alike, knew that a player taking batting practice was required to wear a helmet. *Id.* at 528. We held that the coach had the common law "duty to exercise that degree of care that ordinarily prudent teachers or coaches engaged in the supervision of students of like age as the plaintiff would exercise under similar circumstances." We held further, in no uncertain terms, that "[t]he performance of that duty in this instance was a ministerial, rather than a discretionary, function" because "it involved only the enforcement of a known rule requiring that student athletes wear batting helmets during baseball batting practice. The promulgation of such a rule is a discretionary function; the enforcement of it is a ministerial function." *Id.* at 529. It is significant that the batting helmet rule was a rule, in part, simply because everyone knew it to be *the rule*—it was a commonly known, imperative part of baseball practice.

Like the "known rule" for wearing batting helmets in *Yanero* that left no room for discretion, the known rule cited by the Board that forbade the re-use of a confidential informant after his cover was blown was "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero* at 522. It is "an essentially objective and binary directive." *Haney,* 311 S.W.3d at 242. You follow the rule or you violate it; there is no in-between area for discretion about how to comply. Adherence to the rule may require some

modicum of forethought and planning, but it requires no judgment.

The Board's finding that it is the known rule of law enforcement that a compromised informant must not be re-exposed to the danger of a buy/bust operation is a finding of fact. While the application of that rule and whether it creates ministerial or discretionary duties are issues of law falling within the purview of reviewing courts, the Board's findings of fact upon the existence of such a rule was supported by substantial evidence, and is therefore conclusive. *Commonwealth v. Mudd,* 255 S.W.2d 989, 990 (Ky.1953). We find no basis upon which to reject that finding by the Board of Claims—qualified experts testified consistently with the finding—and the Court of Appeals erred in disregarding it.

In summary, while we agree that some of the acts of the KSP leading up to Gaither's death were discretionary acts, the act of using him in a buy/bust operation within the same community after his identity as a police informant had been compromised violated a known rule defining prudent behavior in the use of a confidential informant, and was, therefore, the negligent performance of a ministerial act. We reverse the Court of Appeals' conclusion to the contrary.

## III. ISSUES RAISED BY THE CABINET ON CROSS–APPEAL

The Cabinet preserved for appellate review a number of issues which it argues should compel the reversal of the Board of Claims' award. Because both the Franklin Circuit Court and the Court of Appeals relied upon other grounds for reversing

---

**13.** In fact, one of the plaintiff's claims against the school district and its athletic director was their failure to adopt a rule mandating the use of batting helmets, a failure that we characterized as clearly discretionary.

the Board of Claims, those issues have not been addressed. Since we reverse the Court of Appeals and would otherwise reinstate the Board's award, we are compelled now to address those points.

**A. Notwithstanding the "special relationship" test of *Fryman v. Harrison*, the KSP owed a duty to Gaither.**

■ The Cabinet first contends that the state could have no liability to the Estate because the KSP had no duty to protect Gaither from harm during his work as a confidential informant. Carried to its logical end, the argument that the KSP had no duty to Gaither would mean that, after sending him unarmed into the meeting with Noel, the detectives could have walked away from the scene and completely abandoned Gaither to fend for himself as best he could. We reject that contention, and under the unique circumstances of this case we find that position to be wholly untenable.

The Cabinet relies primarily upon the two-pronged "special relationship" rule set forth in *Fryman v. Harrison*, 896 S.W.2d 908, 910 (Ky.1995), which says that "[I]n order to establish an affirmative legal duty on public officials in the performance of their official duties, there must exist a special relationship between the victim and the public officials." To determine when a "special relationship" exists, *Fryman* incorporated the two-pronged test described in *Ashby v. City of Louisville*, 841 S.W.2d 184, 190 (Ky.App.1992). Under that test; there is no "special relationship" unless the victim of the alleged act of negligence by a public official was "in state custody or was otherwise restrained by the state at the time in question, and [ ] the violence or other offensive conduct was perpetrated by a state actor." *Id.* at 190. The Cabinet cites, and we have also considered, *Com-*

*monwealth, Corr. Cabinet v. Vester*, 956 S.W.2d 204 (Ky.1997), where it was held that members of the general public fifty miles from the prison at Eddyville who were murdered by prison escapees six days after the escape, had no "special relationship" with the prison employees whose negligence allegedly caused the escape.

*Collins v. Hudson* 48 S.W.3d 1 (Ky.2001) is our only case involving claims arising from the murder of a confidential informant. In *Collins*, a confidential informant was killed several months after the inadvertent disclosure of his identity. He was murdered by an individual against whom the informant was expected to testify, but at the time of his killing, the informant was not subject to the supervision and control of the police. In *Collins* we expressly declined to reevaluate the two-pronged, "special relationship" test of *Ashby* and *Fryman*, noting that "inasmuch as [the claimant] has shown no compelling reason to depart from the authorities relied upon, we decline to reconsider these prior decisions." *Id.* at 6.

The Estate of Lebron Gaither, however, has provided a compelling reason for us to consider how the two-prongs of the special relationship test fit into the context of the relationship between a confidential informant and his police supervisors during an ongoing undercover operation. Upon that consideration, and for the reasons expressed below, we conclude that although the unique police-informant relationship presented by this case falls outside the strictures of the *Fryman–Ashby* test, it nonetheless created a duty owed by the police to their informant. Upon that basis, we affirm the decision of the Board of Claims that the KSP owed a duty to Gaither.

The "special relationship" rule was developed in the context of injuries suffered by members of the general public disas-

sociated with and far removed from negligent acts that allegedly caused their injuries. In *Fryman,* a jailor negligently released an arrestee without requiring the proper bond. Two months later, the claimant, a member of the general public having no connection with the jailor, was assaulted by the negligently released prisoner. In *Ashby,* Louisville police failed to promptly execute an arrest warrant on a domestic violence perpetrator, and nine days later he murdered the victim in the domestic violence case. As in *Fryman,* the murder in *Ashby* was far removed from the allegedly negligent conduct of failing to serve the warrant. Moreover, in each case, including *Vester,* the infliction of the injury by a third party was entirely unforeseeable.

We noted in *Fryman:* "In this analysis of legal duty, we have determined that the major issue is the question of foreseeability. . . . If the ultimate injuries were not foreseeable to the governmental officials in their individual capacity, and if the victim of the injury was not identifiable, there was no duty to prevent such an injury." *Id.* at 909. The lack of foreseeability was the compelling force for the prongs used to define the "special relationship" rule—an injury could be foreseeable if it was inflicted by a "state actor" upon an individual who was "in state custody." In the instant case, however, injury to the confidential informant was not only foreseeable, it was entirely predictable, as the 57–year old quotation from *Roviaro* indicates.[14]

There is no sound reason that we should apply a rule based upon the lack of a foreseeable injury in a case where the injury was uniquely foreseeable. We also find no reason to apply a rule grounded

upon the absence of any direct connection between the injured victim and a state agency in a situation, like the case now before us, in which a state agency actually created a connection with the injured claimant, and then repeatedly fostered the continuation of that relationship. As the facts of this case plainly reveal, the narrow confines of the *Fryman–Ashby* test do not capture the only occasions on which a negligent government official should reasonably foresee that his negligence is likely to put a specific individual in harm's way at the hands of a specifically-known and identifiable third party. The *Fryman–Ashby* test is ill-suited to circumstances of a confidential police informant while actively engaged in an undercover operation.[15]

We cannot ignore the well-established fact that, contrary to the circumstances that led to the adoption of the *Fryman–Ashby* test, the state officials involved here actively sought out the individual who was destined to become the victim. Prior to the injury upon which the claim was based, law enforcement representatives came to Gaither soliciting his service as a confidential informant; he did not approach them out of the blue to volunteer his service. By seeking out his help, offering to pay him, and to oversee his work, the KSP created a relationship of trust with him. They agreed to help him with money and a milder punishment; he in return agreed to gather evidence by making recorded drug buys from suspected drug traffickers.

While using Gaither's assistance in an undercover investigation like the final buy/bust with Noel, the KSP detectives in charge of the operation retained "complete

---

14. *See* footnote 12.

15. We need not revisit the issue in the context presented by *Collins v. Hudson,* where, unlike the instant case, the confidential informant was not actively engaged in undercover work under the immediate supervision of police officers when he was killed.

control"[16] over his activity; they asked for and expected his full cooperation.[17] He agreed to meet with Noel wearing the recording device and the radio transmitter; the detectives agreed to standby wearing the badges and guns needed to protect him. We need not determine if at that time Gaither was in "state custody." As defined by the traditional standards developed in other contexts, he most likely was not. But he was under the direct supervision of the KSP and he had a right to expect the benefit of their watchful eye and keen attention to his protection. Such circumstances created a "special" relationship between Gaither and the KSP that does not exist between the KSP and members of the general public who may by happenstance indirectly fall victim to police negligence. Although Gaither was not killed by a "state actor" as required by the second prong of the *Fryman–Ashby* test, his death at the hands of Noel was a clearly foreseeable event after Gaither was so openly and publicly disclosed as an informant who had done business with Noel in the past.

So, while the relationship established by the KSP with Gaither falls outside the "special relationship" described in *Fryman* and *Ashby,* at least while he was actively working as an undercover operative, the KSP assumed a duty to exercise ordinary care for his safety. We therefore conclude that the Board of Claims correctly determined that the KSP owed a duty to Gaither, and that its liability may be predicated upon a breach of that duty.

**B. Substantial evidence supported the Board's finding that the KSP violated an applicable standard of care.**

■ The Cabinet argues that no competent evidence was introduced to establish

that the KSP officers' conduct fell below the standard of care ordinarily expected of officers in similar situations. We disagree with the Cabinet's contention that the prosecutors and judges who testified were incompetent to opine upon the standards of care applicable to police. To the extent that expert knowledge is even required to assess the reasonableness of the officer's conduct, there is no evidentiary requirement that only police officers can give expert opinion on conducting a criminal investigation. KRE 702 allows for opinion testimony of a witness "qualified as an expert by knowledge, skill, experience, training, or education." We are satisfied that the judges and prosecutors who testified met the requirements of KRE 703.

**C. Noel's criminal act of murdering Gaither was not a superseding cause that insulated the KSP for its negligence in connection with Gaither's death.**

■ Next, the Cabinet contends that the apportionment of any fault to the KSP for Gaither's death was improper because the criminal act of Noel was a superseding cause which broke the chain of proximate causation connecting the police negligence and Gaither's death. We refer to our opinion in *Williams v. Kentucky Dep't of Education:*

'[I]f the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause.' *NKC Hosps., Inc. v. Anthony,* Ky.App., 849 S.W.2d 564, 568 (1993) (citing William L. Prosser, Law of Torts 272 (4th ed.1978) and *Deutsch v. Shein,* Ky., 597 S.W.2d 141, 144 (1980)).

---

**16.** *See* KSP General Order OM–C–3, page 2. (4–16–90)

**17.** *Id.*

The basic premise of a superseding cause is that it is "extraordinary and unforeseeable." *House v. Kellerman,* Ky., 519 S.W.2d 380, 383 (1974)

113 S.W.3d 145, 151 (Ky.2003).

The Cabinet argues that "the KSP suspected Noel was a drug trafficker—not a murderer" and, therefore, they could not have foreseen the possibility that he would murder Gaither. That argument belies the undisputed fact that it is well-known in the world of criminal investigation and prosecution that the anonymity of informants must be protected. We refer again to the *Roviaro* quotation cited at footnote 12, *supra:* "Once an informant is known, the drug traffickers are quick to retaliate." The expectation that retaliation will occur is the reason that informants are "confidential." The criminal action of Noel was a known risk and a foreseeable consequence of using Gaither in a buy/bust operation against Noel after Gaither's anonymity had been compromised. It is therefore not a superseding cause that relieves the KSP of its share of the apportioned fault.

**D. The applicable statutory maximum award was $200,000.00, not the $100,000.00 limitation imposed by the pre–2000 version of KRS 44.070(5).**

█ Finally, the Cabinet contends that any award recoverable by the Estate is limited to $100,000.00. At the time of Gaither's death in 1996, KRS 44.070(5) limited the Board of Claim's authority to monetary awards of $100,000.00 or less. However, in 2000, after the Estate's claim was filed, but before it had been adjudicated by the Board, the legislature amended KRS 44.070(5), enlarging the Board's authority to $200,000.00. The Cabinet argues that the statutory cap in effect at the time of Gaither's death controls. We disagree.

The post–2000 version of the statute provides that "a single award of money [by the Board of Claims] shall not exceed two hundred thousand dollars ($200,000), exclusive of interest and costs." We held in *University of Ky. v. Guynn,* 372 S.W.2d 414, 416 (Ky.1963), "The date [the claimant's] cause of action accrued had no relevancy to the extent of the State's liability (except to start the running of a limitation period)." The statute clearly speaks to the time of the award, not to the date upon which the claim accrued. Accordingly, we conclude that the Board was not limited to the pre–2000 maximum of $100,000.00, but was authorized to make an award in this case of up to $200,000.00.

**E. The Damages awarded by the Board of Claims is not consistent with the Evidentiary Record.**

During the evidentiary hearing conducted upon the Estate's claim, the parties stipulated before the hearing officer that the present value of the Estate's "lost earnings" was $490,024.00. The Board, however, found that the value of the destruction of Gaither's power to earn money resulting from his untimely death was $562,433.00. We recognize that the concept of "lost earnings" is not precisely the same thing as the destruction of a decedent's power to earn money. However, we find nothing in the record to support the additional amount found by the Board and nothing in its Final Order demonstrates the basis of its calculation. With the evidence that the recoverable funeral expense was $5,573.08, the total damage award supported by the evidence was the sum of $490,024.00 plus $5,573.08, or $495,957.08. Applying the 30% of fault that the Board apportioned to the KSP, the award should have been $148,787.12.

We agree with the Cabinet that the award provided in the Final Order exceeded what was supported by the evidence. We therefore remand the matter to the Board for entry of a Final Order reflecting the correct award of $148,787.12.

## IV. CONCLUSION

For the reasons set forth herein, we reverse the opinion of the Court of Appeals. We further remand this matter to the Board of Claims for entry of a Final Order awarding Appellant the sum of $148,787.12.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE and SCOTT, JJ., concur. KELLER, J., not sitting.