RENDERED:  OCTOBER 7, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1409-MR

ESTATE OF EMILY SNOW                                             APPELLANT

v.
APPEAL FROM BOYLE CIRCUIT COURT
HONORABLE DARREN W. PECKLER, JUDGE
ACTION NO. 21-CI-00191

COMMONWEALTH OF KENTUCKY,
TRANSPORTATION CABINET,
DEPARTMENT OF HIGHWAYS AND
KENTUCKY BOARD OF CLAIMS
F/K/A KENTUCKY CLAIMS
COMMISSION                                                        APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, McNEILL, AND K. THOMPSON, JUDGES.

COMBS, JUDGE:  The Estate of Emily Snow appeals from a judgment of the

Boyle Circuit Court affirming a decision of the Kentucky Board of Claims in favor

of Commonwealth of Kentucky Transportation Cabinet, Department of Highways.

After our review, we affirm.

In the late night hours of June 29, 2014, 16-year-old Emily Snow was killed in a one-car accident on KY 1856 in rural Boyle County. She was riding without a seatbelt in the back seat when the car neared the end of a curve, crossed the oncoming traffic lane, left the wet road, and struck a tree. Jacob Smith, the 18-year-old driver, admitted to a deputy sheriff at the scene that he had been drinking beer and that he was travelling too fast to negotiate the turn. The speed limit was not posted, but the regulatory limit is 55 miles per hour. Signage consisted of a single reflective chevron, mid-curve.

On June 29, 2015, the co-administrators of Snow's estate (the Estate) filed a wrongful death action with the Board of Claims against the Transportation Cabinet. They alleged that Snow's death was caused by the failure of the Transportation Cabinet to post adequate signage to warn drivers of the "curvature and grade of the road." The Transportation Cabinet denied negligence and asserted its immunity as a defense.

On February 13, 2019, an administrative hearing was conducted in Boyle County. The parties presented testimony from various experts and lay witnesses. For the Estate, Jerry Pigman, an engineer and crash reconstructionist, testified (by deposition) that based upon his analysis, the curve would be challenging to navigate at a speed in excess of 25 to 30 miles per hour. Because the speed limit along the road was 55 miles per hour, Pigman felt that a right turn

sign posted ahead of the curve was the minimum signage that he would have recommended.  He indicated that two additional chevron signs erected along the curve would have guided drivers safely through it.  Pigman acknowledged that multiple passengers in a car generally proved distracting to teen drivers; that the driver's ability to drive safely was impacted by his consumption of alcohol; and that the failure to engage seatbelts resulted in more severe injuries to passengers.

On cross-examination, Pigman admitted that relevant provisions of the Manual of Uniform Traffic Control Devices (MUTCD), with which he was very familiar, did **not** require the signage he recommended; instead, that manual directed that an engineer (or one at his direction) could use his own judgment and discretion with respect to traffic control devices placed on lightly travelled roads like KY 1856.  He specifically agreed that civil engineers (and those at their direction) were expected to use their judgment and discretion when making decisions regarding signage on a road scarcely travelled, adding, "I think that engineering judgment is essentially discretionary decision making. . . ."  Moreover, he acknowledged that an engineer was authorized by the provisions of the MUTCD to consider the crash history of a roadway before arriving at a decision with respect to signage.  He acknowledged that he had not considered this factor before arriving at his opinion.

Henry Cease, Jr., an accident reconstructionist, testified that the curve should have been marked with a curve warning sign indicating a recommended speed of 25 miles per hour along with multiple chevron signs in the curve. On cross-examination, he acknowledged that he had no experience implementing or interpreting the MUTCD and no expertise in the Transportation Cabinet's policies, practices, or procedures. His investigation indicated that the road banked properly into the curve making it inherently easier to navigate.

The Transportation Cabinet admitted that it was responsible for the maintenance of KY 1856 -- including signage. However, it denied any negligence and argued that Snow's death was caused by the negligence of others -- including the driver. Moreover, it contended that it was immune from liability for any negligence in the performance of its discretionary functions, specifically including decisions regarding road signage on lightly travelled roadways.

Deputy Sheriff Phillip Dean testified that he responded to the crash and investigated the incident. He indicated that KY 1856 was not known for traffic accidents and confirmed that it was a rural roadway that was only lightly travelled.

Jeffrey Sparks, an engineering technologist with the Transportation Cabinet, testified that KY 1856 was inspected for safety by the Boyle County Maintenance Garage at least once per month. He indicated that foliage had been trimmed from the sides of the roadway approximately one month before the fatal

-4-

collision. He did not know when, why, or by whom the reflective chevron sign had been posted at the curve.

Kenneth Robert Agent, a civil engineer, instructor, and researcher employed by the University of Kentucky College of Engineering, testified that he taught engineers and other transportation professionals various subjects related to placement of traffic control devices and highway safety. Agent described KY 1856 as a "relatively narrow, very curvy road, very, very low average daily traffic. . . ." He observed that the road was relatively flat at the site of the collision and that given the "long tangent leading to the curve," a driver could easily see it from at least 200 feet with low beam headlights illuminated. He indicated that the sight line was enhanced by the existence of a double centerline pavement marking that would give a driver "delineation that [he is] going into a right-hand curve."

Agent explained that the exercise of engineering judgment would not indicate that the curve at the site of the collision required signage for several reasons. First, the change in roadway alignment did not "violate [the driver's] expectancy" because "the road is just one curve after another." Next, he noted that a lack of any serious accident history or complaints about the safety of the road would weigh in favor of a decision not to erect signage. Additionally, he observed that the rural road was only very lightly travelled. In Agent's opinion, "there was [sic] plenty of visual ques [sic] to drive through the curve fine at that location

-5-

without any signs." Reviewing specific provisions of the MUTCD, Agent testified that under these circumstances, decisions with respect to traffic control devices placed at this location were absolutely a matter of discretion. He indicated that he had been unable to determine when or how the single reflective chevron had come to be placed in the curve.

Based upon the evidence presented, the hearing officer found that the curve where the car left the roadway could be safely negotiated at a speed of approximately 20 to 25 miles per hour. He further found as follows:

> [Smith] would have already travelled about five miles on this road that evening and gone around several similar curves. [KY 1856] is lightly travelled . . . . There was one other reported accident listed at this mile marker in a nine-year span from 2009 through 2017. It is not clear whether that accident was in this curve. There was no evidence that the Department of Highways had notice of any prior accidents at this location.
>
> [KY 1856] is marked at this location with a yellow center line and with one chevron for northbound traffic, indicating a right-hand curve. This sign is placed on the left side of the road, in the curve, and can be seen depending on the season and how recently the foliage has been trimmed, at a distance varying from approximately 150 to 300 feet. In June of 2014, the foliage was fully out, but it had been trimmed about a month prior.

The hearing officer observed that the Department of Highways must exercise ordinary care to keep the highways in a reasonably safe condition for travel, noting, however, that it is not a guarantor of the public's safety. Citing this

Court's opinions, he also noted that decisions concerning the placement of signs and guardrails on our highways generally involve the exercise of discretion and enjoy immunity from liability. However, he concluded that where decisions violate a "known rule" or standard, state agencies are not entitled to immunity.

The hearing officer observed that "known rules" are well established in the field of highway safety. Citing provisions of the MUTCD, the hearing officer determined that turn signs, advisory speed signs, and chevrons on the approach to this curve on a lightly travelled road "'may' be used, 'based on engineering judgment.'" With respect to lightly travelled roadways, he concluded that the MUTCD expressly leaves signage decisions to engineer discretion. He rejected the argument that once the Transportation Cabinet made a decision to place a reflective chevron at this location, it triggered a ministerial duty to erect the full complement of signage. "[T]he only established rules say that the decision is discretionary."

The hearing officer concluded that decisions made by the Highway Department with regard to signage at this curve on KY 1856 were part of its discretionary function and, consequently, that it was immune from liability for any negligence associated with these decisions. The order that he entered on March 30, 2020, recommended that the claim be dismissed.

In an order entered on July 28, 2020, the Board of Claims disagreed and rejected the hearing officer's recommendation. It found that "ministerial acts that led to the engineering decision to place signs were either not performed or performed negligently." This finding was based on the testimony of the Estate's engineers indicating that the signage at the curve was insufficient to provide proper warning of danger inherent in the curve. It ordered that the claim be remanded to the hearing officer for a recommendation on damages.

Upon remand, the hearing officer entered an amended recommended order as directed in which he recited that the Transportation Cabinet "was negligent in the performance of certain ministerial acts, leading to its decision to place only one warning sign in this curve, and that such negligence was a significant factor in causing this accident." He concluded that the driver, Jacob Smith, was negligent by driving at a speed unsafe for the road conditions and that Snow was negligent by failing to exercise ordinary care for her own safety (*i.e.*, not wearing a seatbelt). In an order entered on February 3, 2021, the hearing officer recommended that liability be apportioned 30 percent to the Transportation Cabinet; 60 percent to Smith; and 10 percent to Snow. He recommended judgment against the Transportation Cabinet in the amount of $104,286.00.

In an order entered on May 3, 2021, the Board of Claims reversed its original decision and now rejected the hearing officer's amended recommendation

that it had previously directed on remand. Its final order included the following

reasoning:

> Although the Claimant agreed the decision to install signage was a discretionary function, it argued that the judgment required to evaluate whether signage is necessary and sufficient in any particular location is a ministerial function and subject to liability. The Claimant's position is that once the [Transportation Cabinet] decided to install signage they had to use every means necessary to ensure the signage was sufficient. The Claimant offered testimony that the signage was insufficient for the curve and argued that the actual steps necessary to properly measure the curve, ball banks, etc., were not performed, and so there was a negligent performance of the ministerial duty. However, there was no testimony to prove whether proper measurements were performed to support such a finding nor was there any proof as to what ministerial steps are necessary to form the basis of the engineering judgment regarding the sufficiency of the signage.

> The hearing officer noted in his original recommendation that there was no testimony from either party as to how long the chevron signage had been in this curve, who made the decision to place it there, why there was no other signage, or any other consideration that went into signage at the subject location.

> [The Transportation Cabinet] offered testimony that since the Manual on Traffic Control Devices (MUTCD) was adopted in 2009, and based on that manual, it placed a priority on improving signage on roads with more than 1000 vehicles per day. However, the same MUTCD renders signage on roadways with less than 1000 cars per day, discretionary, and based on engineering judgment. The subject roadway was one with less than 1000 cars per day. On these less travelled roads, signage depends on whether there is an accident

-9-

history at any particular location before [the Transportation Cabinet] places additional signage. There is a lack of competent proof that the subject roadway was known to have any accident history that would place [the Transportation Cabinet] on notice that additional signage might be necessary.

The decision to place signage at the subject location in this case, based on the proof, was made on engineering judgment, which is a discretionary function, and is not subject to the waiver of sovereign immunity. There is also insufficient proof of any negligently performed alleged ministerial duty in this case.

The Board of Claims ordered that the claim be dismissed.

On May 27, 2021, co-administrators of Snow's Estate filed a petition for judicial review in the Boyle Circuit Court. They argued that the final order of the Board of Claims was not based on substantial evidence; that its conclusions of law were erroneous; and that it acted beyond its authority.

In an order entered November 17, 2021, the Boyle Circuit Court affirmed the decision of the Board of Claims to dismiss. It held that substantial evidence supported the Board's findings of fact and that it did not err in its application of the law. This appeal followed.

On appeal, the Estate argues that the Boyle Circuit Court erred by failing to conclude that it had shown that the Transportation Cabinet was negligent in the performance of a ministerial act. We disagree.

-10-

Because the Estate was unsuccessful before the Board, the Board's findings of fact **must be accepted** unless the evidence was so strong and persuasive as to compel a finding in favor of the Estate. *Commonwealth, Dep't of Highways v. Hoskins*, 495 S.W.2d 177 (Ky. 1973). However, "[w]hen the outcome of a case turns on an issue of law, . . . appellate review is *de novo*." *Western Kentucky Coca-Cola Bottling Co., Inc. v. Revenue Cabinet*, 80 S.W.3d 787, 790 (Ky. App. 2001).

The Commonwealth and its agencies and subdivisions are immune from liability unless the Commonwealth has waived its immunity. *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001). Section 231 of the Kentucky Constitution provides that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." The Board of Claims Act, KRS[1] 44.070 *et. seq.*, provides for a limited waiver of sovereign immunity for claims based on the negligent performance of ministerial acts by officers, agents, or employees of the Commonwealth while acting within the scope of their employment. *Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014). "In any appeal from a decision of the [Board of Claims], the critical inquiry is whether the allegedly negligent act is discretionary or ministerial." *Commonwealth v. Russell*, 578 S.W.3d 747, 750 (Ky. App. 2019).

---

[1] Kentucky Revised Statutes.

The Supreme Court of Kentucky has held that if an act involves "policy-making decisions and significant judgment," it is discretionary; if it involves "merely routine duties," which "will typically be established by statutes or regulations that very clearly and specifically set forth those actions that the agency must take," it is ministerial. *Commonwealth, Transportation Cabinet, Dep't of Highways v. Sexton,* 256 S.W.3d 29, 32-33 (Ky. 2008) (citations omitted). A ministerial act "requires only obedience to the orders of others" and a duty that is "absolute, certain, and imperative" whereas a discretionary act requires "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Gaither*, 447 S.W.3d at 633 (citation omitted).

It is undisputed that the Manual on Uniform Traffic Control Devices is "the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel[.]" 23 Code of Federal Regulations (C.F.R.) § 655.603 (2010). The purpose of the MUTCD is to make uniform all traffic control devices across the various jurisdictions within the United States. KRS 189.337(2) requires the Department of Highways to "promulgate and adopt a manual of standards" for control of traffic devices. To implement this provision, the Transportation Cabinet issued 603 Kentucky Administrative Regulation (KAR) 5:050. Section 1 of the regulation directs that "[t]he standards and specifications

-12-

set forth in the [MUTCD] shall apply to all traffic control devices . . . in Kentucky."

MUTCD Section 2C.06 provides a chart of road signs used to warn of a change in roadway alignment. It creates specific standards for the use and placement of signs signaling an upcoming curve in the roadway. However, these standards are only applicable to roadways with more than 1,000 vehicles in average daily travel. The provision *authorizes* the use and placement of standard warning signs on little used roads. However, it sets no requirements nor does it make any recommendations for warning signs erected on them -- except to advise decision-makers that their use *should be kept to a minimum*. MUTCD Section 2C.02. Instead, the use and the placement of standard warning signs on lightly travelled roads are expressly and explicitly left to "engineering judgment." "Engineering judgment" is defined by the MUTCD as:

> the evaluation of available pertinent information, and the application of appropriate principles, provisions, and practices as contained in this Manual and other sources, for the purpose of deciding upon the applicability, design, operation, or installation of a traffic control device.

The MUTCD directs that engineering judgment shall be exercised by an engineer (or by an individual working under his supervision) through the application of procedures and criteria established by the engineer. Documentation of engineering judgment is expressly *not* required.

While erecting roadway safety and traffic control measures is manifestly part of the Transportation Cabinet's regular duties, the decision on whether to do so (and how) on a lightly travelled road is discretionary. *See Hammers v. Plunk*, 374 S.W.3d 324, 330 n.3 (Ky. App. 2011) (holding that "determinations involving such things as whether a guardrail or sign should be placed in a certain area of roadway are discretionary"); *Bolin v. Davis*, 283 S.W.3d 752 (Ky. App. 2008) (holding that a county road engineer's decision not to install a guardrail was discretionary); *Estate of Clark ex rel. Mitchell v. Daviess County*, 105 S.W.3d 841 (Ky. App. 2003) (holding that a decision not to install a guardrail was discretionary).

There is no statute or regulation requiring the Department of Transportation to install signage of any kind on little used roads like KY 1856. Therefore, we cannot construe its evaluation of a road's safety or its exercise of engineering judgment as anything other than discretionary. Furthermore, testimony indicated that the Transportation Cabinet is required to prioritize the use of its resources. There was testimony that this rural road is regularly inspected; that it has not been the scene of numerous collisions; that it was banked correctly; and that the marking of the double centerline pavement adequately warned drivers of the upcoming curve. These factors indicate that KY 1856 was not unreasonably

-14-

dangerous absent additional signage and that the Transportation Cabinet used its discretion in deciding where and how to erect its road safety signs.

Our analysis indicates that any decision to erect (or not) a curve warning sign on this little-used roadway involved policy making and the exercise of significant judgment. These types of decisions are not subject to the statutory waiver of immunity. Consequently, there is no liability even where the decisions could be viewed as negligent because they were discretionary rather than ministerial.

Nevertheless, the Estate argues that the Transportation Cabinet is liable for its failure to "exercise engineering judgment, take measurements, and determine the appropriate speed in the placement of all signage." It relies on our holding in *Commonwealth v. Estate of Franklin*, No. 2014-CA-000201-MR, 2015 WL 2337844 (Ky. App. May 15, 2015), a recent, unpublished decision, in support of its contention. We are not persuaded by reference to our decision in *Estate of Franklin* because the critical facts underlying the issues considered are distinctly distinguishable.

In *Estate of Franklin*, the Board of Claims found from the evidence that an advisory speed sign (indicating a safe speed of 25 m.p.h.) posted in a curve was gravely misleading given the unusually dangerous slope of the roadway and the fact that the curve had been the scene of numerous crashes. We affirmed its

-15-

conclusion that the Transportation Cabinet's decision to merely mark an improperly banked curve with a speed advisory sign rather than to reconstruct the badly banked road was a discretionary act. However, we also affirmed its conclusion that the Transportation Cabinet's implementation of the specific requirements of the MUTCD related to signage was a ministerial act -- specifically including the exercise of engineering judgment and engineering studies where circumstances demand. We agreed that the Transportation Cabinet was negligent by failing to evaluate the existing advisory speed and curve signage on a roadway that it should have known was unreasonably dangerous and that had been the scene of numerous accidents -- at least one of which included a fatality.

In the case now before us, the Board of Claims found that no evidence had been presented to indicate that the Transportation Cabinet failed to exercise its discretion to place (or to retain) the single chevron in the curve on KY 1856 where the car involved left the roadway. No evidence was presented to indicate that the road was unreasonably dangerous (because of an error in its construction, for example) or that it was made so by the placement of the single chevron. There was no evidence to indicate that the placement of the chevron violated the requirements of the MUTCD. Consequently, the Board of Claims did not err by concluding that the Transportation Cabinet was immune from the Estate's negligence claim.

We affirm the order of the Boyle Circuit Court that affirmed the holding of the Board of Claims dismissing this claim.


ALL CONCUR.


BRIEFS FOR APPELLANT:

J. Hadden Dean
Danville, Kentucky

BRIEF FOR APPELLEE
COMMONWEALTH OF
KENTUCKY, TRANSPORTATION
CABINET:

Marlin A. Jones
Frankfort, Kentucky