RENDERED:  APRIL 18, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1275-MR

BRYAN TYLER BOERSTE                                    APPELLANT


APPEAL FROM WASHINGTON CIRCUIT COURT
v.           HONORABLE KAELIN G. REED, JUDGE
ACTION NO. 16-CI-00064


MICHAEL COTTON; CITY OF
SPRINGFIELD, KENTUCKY; AND
SPRINGFIELD POLICE
DEPARTMENT                                              APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; A. JONES AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  Bryan Tyler Boerste has appealed from the summary judgment of the Washington Circuit Court resolving his personal injury suit against defendants Michael Cotton and the City of Springfield, Kentucky, in their favor. Boerste sustained a head injury when he fell from the roof of his car while it was

being towed off the lot of a college campus. Having considered the record, the parties' excellent briefs, and applicable caselaw, we affirm.

For our recitation of the facts and partial procedural history, we shall rely upon portions of the 2022 opinion and order of the United States District Court, Western District of Kentucky, entered following the removal of the case from state court in 2017. The federal district court granted summary judgment to the defendants on Boerste's federal due process claims and remanded his remaining state claims.

## I. Summary Judgment Record

Like many accidents, this fall resulted from a series of questionable decisions and strange occurrences – most of which are undisputed.

*First*, drug use on campus. On April 15, 2016, Bryan Tyler Boerste picked up two friends – Isaiah Barron and Makayla Ostertag – so they could visit Seth Mattingly on the campus of St. Catharine College in Springfield, Kentucky. The group arrived after dark and stayed in Mattingly's dorm room. Boerste and Barron had brought several drugs – cocaine, Xanax, and marijuana – that they and their friends used that night. Around 7:13 a.m. on April 16th, campus security received a report that Boerste and Barron were attempting to open doors in a dorm and acting in an unusual manner.

*Second*, an order to leave. Joshua Baker – a security guard employed by Mattingly Security and a defendant in this case – escorted the pair out, told them to leave, and contacted the Springfield Police Department because he was worried that they were intoxicated.

-2-

Officer Cotton responded to the call and conducted a breathalyzer test, which did not detect alcohol. Lacking probable cause to make any arrests, Cotton told the group to leave campus. But one of the friends and some belongings remained in the dorm room, so Boerste drove his car to an adjacent parking lot on the campus. Cotton, at Baker's direction, drove to the other lot and again ordered the men to leave campus.

*Third*, a traffic accident. Boerste then drove toward the campus entrance, through a stop sign, and off the pavement onto a steep incline where his car got stuck. Officer Cotton ordered Boerste and Barron out and accused them of having used drugs, which Boerste denied repeatedly. When Officer Cotton threatened to get a warrant, Boerste said he wanted to call his father, apparently a police officer in another jurisdiction. Cotton encouraged Boerste to make the call because Cotton believed the friends were too impaired to drive.

*Fourth*, an argument over a towed car. A college administrator told Baker to call for a tow truck to haul away Boerste's vehicle. Baker contacted Ellis Towing, which sent its driver, Kevin Bewley. Officer Cotton remained on the scene to observe, but radioed dispatch advising he was "clear" and could take other calls. Boerste's friends also arrived, saw his car being towed, and became belligerent: they threatened, yelled, and cursed at Officer Cotton, Baker, and Bewley.

*Fifth*, the decision to climb atop a car sitting atop a tow truck. Boerste climbed onto the roof of his vehicle as Bewley loaded it onto the tow truck. Officer Cotton and Baker told Boerste to get down several times, but he refused. Boerste's friends stood nearby, recorded Snapchat videos, called Officer Cotton "savage," said Boerste "don't give a f***," and declared that the officers couldn't "take [Boerste's] s***."

-3-

*Sixth*, the injury. Bewley climbed into his truck and drove off with Boerste on top of the attached car. Cotton followed close behind in his cruiser. Not long after Bewley pulled away, Cotton and Baker saw Boerste either jump or fall off the towed car. Boerste landed on the pavement next to a guardrail, causing serious head injuries. Seeing this, Officer Cotton radioed for EMS. An air lift rushed Boerste to the University of Louisville Hospital for treatment.

The parties disagree, however, about some of the key interactions before Bewley drove off.

According to Officer Cotton, he didn't instruct Bewley to begin to drive. Cotton told the Police Department he never would've given such an order and followed in his car so he could stop Bewley.

Bewley, on the other hand, says he did not know Boerste was still on top and would not have left if he was aware of that. He also contends he did not leave because Cotton told him to, and in fact refused Cotton's requests.

Boerste and his friends, for their part, accuse Cotton of telling Bewley to drive off with Boerste on top so Cotton could arrest Boerste on a public road. One friend, Cameron Mattingly (no apparent relation to Defendant Mattingly Security), wrote a statement about the incident: "Tyler gets on the car says you can't take it. Older Officer [Cotton] told the driver to drive off anyway." Allegedly, Cotton did not believe he could arrest Boerste on private property and needed him moved to a public road. And in fact when Bewley drove off, video shows that Cotton followed behind without stopping Bewley.

As for Boerste's tumble from the car, the parties again point to conflicting evidence. Not long after Bewley pulled away, Boerste either jumped off the car (according to Cotton) or fell off (according to Baker).

In considering summary-judgment motions, the Court must view the facts in the light most favorable to the plaintiff. *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 469 (6th Cir. 2002). A reasonable jury could conclude based on this record that Cotton told Bewley to drive off with Boerste on top of the car, that Cotton didn't understand his jurisdiction, and that Bewley followed Cotton's instruction. Whether a jury would in fact believe that account at trial, and whether those facts would even give rise to a viable legal theory necessitating a trial, are of course separate questions.

## II. This Litigation

Boerste sued several defendants in Washington County Circuit Court: Officer Michael Cotton, the City of Springfield and the Springfield Police Department, Joshua Baker and his employer Mattingly Security, and Kevin Bewley and his alleged employers Ellis Towing and Ellis LLC. Boerste's complaint asserted numerous claims, including negligence, intentional infliction of emotional distress, assault and battery against Bewley, various forms of vicarious liability against the employers, and punitive damages. Along with these state-law claims, Boerste also alleged that Officer Cotton and Bewley (as Cotton's agent) "deprived plaintiff of his constitutional rights and equal protection" under 42 [United States Code (U.S.C.)] § 1983. Boerste further claimed that Cotton had a "special relationship" with Boerste, imposing a duty on him to prevent the ensuing harm. Finally, Boerste sued the City and Ellis Towing for negligent training, supervision, hiring, and related theories of vicarious liability.

The Defendants timely removed the case to federal court based on these federal claims [and, ultimately, eight motions for summary judgment were filed.] The Court held an in-person hearing on these motions, focusing in particular on the federal claims. This Order grants the Defendants' requests for summary judgment on the

-5-

alleged violations of Boerste's federal Due Process rights and, in the absence of the claims that originally supported federal jurisdiction, remands the remaining state-law claims to state court.

*Boerste v. Ellis Towing, LLC*, 607 F. Supp. 3d 721, 727-30 (W.D. Ky. 2022) (footnotes omitted).

The district court analyzed Boerste's federal claims, including federal substantive due process (whether a special relationship or state-created danger existed), qualified immunity, and municipal liability, finding no merit in any of them. The district court then remanded Boerste's remaining state claims consistent with federal precedent. *Boerste*, 607 F. Supp. 3d at 747.

Upon remand, the Washington County Circuit Court held a status hearing on August 24, 2022, to discuss steps forward, and the parties filed memoranda addressing the preclusive effect of the federal court's rulings. The court heard arguments from the parties later that year. In early 2023, the circuit court ruled that the federal court's rulings did not have a preclusive effect in Boerste's state court claims, in part because the federal due process special relationship issue was not identical to a state court claim involving a public official.

The City of Springfield, Kentucky, the Springfield Police Department (collectively, "the City"), and Springfield Police Officer Michael Cotton all filed

motions for summary judgment in July 2023 seeking dismissal of Boerste's various claims, to which Boerste objected.[1]

In his motion, Cotton addressed Boerste's claims for negligence and gross negligence, arguing that he did not owe a duty to Boerste because there was no special relationship between them. Supporting this claim, Cotton contended that Boerste was not in custody and that the tow truck driver was not a state actor. As to Boerste's intentional infliction of emotional distress (IIED) claim, Cotton argued relief was precluded because Boerste had alleged the traditional tort of negligence, for which emotional distress damages may be recovered. Finally, Cotton argued that he was entitled to qualified official immunity as his actions were discretionary and made in good faith.

In its motion, the City argued that Boerste's claims for negligent hiring, training, and supervision failed due to lack of evidence, and that his negligent training claims against the City were barred by the Kentucky Claims Against Local Governments Act (CALGA) (Kentucky Revised Statutes (KRS) 65.2001(3)).

The court heard arguments from the parties on September 27, 2023. The parties extensively discussed the relevant issues, including whether a special

---

[1] Mattingly Security, Inc., security guard Joshua Baker, Ellis Towing LLC, and tow truck driver Bewley also filed motions for summary judgment. However, we need not discuss those motions as Boerste's claims against these parties were dismissed by agreed order in November 2023.

relationship existed to establish a duty of care (specifically, the issue of custody), the state-created danger doctrine, the claims against the City, and immunity. The court granted the motions for summary judgment on October 2, 2023, thereby dismissing Boerste's claims against Cotton and the City. This appeal now follows.

On appeal, Boerste contends that the circuit court erred in granting summary judgment and dismissing his claims against Cotton and the City.

> Summary judgment is to be cautiously applied and should not be used as a substitute for trial. Granting a motion for summary judgment is an extraordinary remedy and should only be used to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant. The trial court must review the evidence, not to resolve any issue of fact, but to discover whether a real fact issue exists. This review requires the facts be viewed in the light most favorable to the party opposing summary judgment. . . . Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a de novo standard of review with no need to defer to the trial court's decision.

*Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (internal quotation marks and footnotes omitted). With this standard in mind, and construing the facts in Boerste's favor, we shall review the various arguments he raises in his brief.

We shall begin our review with Boerste's claims against Cotton.

-8-

It is elemental tort law that a negligence action requires: (1) a recognized duty; (2) a breach of that duty; and (3) consequent injury. When a court resolves a question of duty it is making a policy determination; and when no legal duty is found to exist, further analysis is unnecessary.

*James v. Wilson*, 95 S.W.3d 875, 889 (Ky. App. 2002) (footnote omitted). The first question we shall address is whether Cotton owed Boerste a duty to prevent the harm he sustained. Boerste argues that he did, while Cotton argues that he did not.

"To establish a negligence claim against a public official, the complaint must allege a violation of a special duty owed to a specific identifiable person and not merely the breach of a general duty owed to the public at large." *Fryman v. Harrison*, 896 S.W.2d 908, 910 (Ky. 1995).

In order for the special relationship to exist, two conditions are required: 1) the victim must have been in state custody or otherwise restrained by the state at the time the injury producing act occurred, and 2) the violence or other offensive conduct must have been committed by a state actor. *Cf. Fryman v. Harrison*, *supra*; *Ashby v. City of Louisville*, Ky.App., 841 S.W.2d 184 (1992).

*City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 392 (Ky. 2001). We shall refer to this as the *Fryman-Ashby* test.

Boerste first attempts to bypass the *Fryman-Ashby* test by arguing that a duty exists because his injury was uniquely foreseeable, citing *Gaither v. Justice*

-9-

*& Public Safety Cabinet*, 447 S.W.3d 628, 639 (Ky. 2014). We disagree that the facts of the current case justify application of this exception.

In *Gaither*, the Supreme Court of Kentucky carved out an exception to the *Fryman-Ashby* test related to confidential informants. It first considered the factual underpinnings of the *Fryman* and *Ashby* cases:

> The "special relationship" rule was developed in the context of injuries suffered by members of the general public disassociated with and far removed from negligent acts that allegedly caused their injuries. In *Fryman*, a jailor negligently released an arrestee without requiring the proper bond. Two months later, the claimant, a member of the general public having no connection with the jailor, was assaulted by the negligently released prisoner. In *Ashby*, Louisville police failed to promptly execute an arrest warrant on a domestic violence perpetrator, and nine days later he murdered the victim in the domestic violence case. As in *Fryman*, the murder in *Ashby* was far removed from the allegedly negligent conduct of failing to serve the warrant. Moreover, in each case, . . . the infliction of the injury by a third party was entirely unforeseeable.

*Gaither*, 447 S.W.3d at 637-38. "The lack of foreseeability was the compelling force for the prongs used to define the 'special relationship' rule – an injury could be foreseeable if it was inflicted by a 'state actor' upon an individual who was 'in state custody.'" *Id*. at 638.

The *Gaither* Court then set forth the factual situation before it, which involved a confidential informant (Gaither) who was murdered during an undercover drug buy after his identity had been compromised.[2]

> We cannot ignore the well-established fact that, contrary to the circumstances that led to the adoption of the *Fryman-Ashby* test, the state officials involved here actively sought out the individual who was destined to become the victim. Prior to the injury upon which the claim was based, law enforcement representatives came to Gaither soliciting his service as a confidential informant; he did not approach them out of the blue to volunteer his service. By seeking out his help, offering to pay him, and to oversee his work, the KSP created a relationship of trust with him. They agreed to help him with money and a milder punishment; he in return agreed to gather evidence by making recorded drug buys from suspected drug traffickers.

> While using Gaither's assistance in an undercover investigation like the final buy/bust with [the suspect], the KSP detectives in charge of the operation retained "complete control" over his activity; they asked for and expected his full cooperation. He agreed to meet with [the suspect] wearing the recording device and the radio transmitter; the detectives agreed to standby wearing the badges and guns needed to protect him.

*Gaither*, 447 S.W.3d at 638-39 (footnotes omitted).

---

[2] Shortly before this undercover buy, Gaither testified openly before the grand jury against the subject of that buy, Jason Derek Noel. A member of the grand jury who knew Noel disclosed this information to him. *Id*. at 631.

The Court concluded that "[t]he *Fryman-Ashby* test is ill-suited to circumstances of a confidential police informant while actively engaged in an undercover operation." *Id*. at 638 (footnote omitted).

> We need not determine if at that time Gaither was in "state custody." As defined by the traditional standards developed in other contexts, he most likely was not. But he was under the direct supervision of the KSP and he had a right to expect the benefit of their watchful eye and keen attention to his protection. Such circumstances created a "special" relationship between Gaither and the KSP that does not exist between the KSP and members of the general public who may by happenstance indirectly fall victim to police negligence. Although Gaither was not killed by a "state actor" as required by the second prong of the *Fryman-Ashby* test, his death at the hands of [the suspect] was a clearly foreseeable event after Gaither was so openly and publicly disclosed as an informant who had done business with [the suspect] in the past.

*Id.* at 639.

Turning to the present case, the facts do not in any way support applying this exception, and we decline to do so. We reject Boerste's argument that the injuries he sustained from falling off a moving tow truck from which he refused to climb down were as "uniquely foreseeable" as Gaither's murder, especially as there is no evidence that Cotton assumed a duty of care for Boerste, like in *Gaither*.

As to the application of the *Fryman-Ashby* special relationship test, we agree with Cotton that Boerste failed to establish either prong. First, we reject

-12-

Boerste's claim that he was in police custody at the time of his injury. Boerste

bases this argument on the theory that Cotton was going to arrest him once the tow

truck was on a public road. But Cotton points out that Boerste could not have been

in custody at that time because he (Cotton) intended to arrest him in the future.

Furthermore, "[a] policeman's unarticulated plan has no bearing on the question

whether a suspect was 'in custody' at a particular time; the only relevant inquiry is

how a reasonable man in the suspect's position would have understood his

situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L.

Ed. 2d 317 (1984) (footnote omitted).

The Supreme Court of Kentucky provided guidance on this issue in

analyzing whether a defendant was in custody for *Miranda*[3] purposes.

> Custody does not occur until police, by some form of
> physical force or show of authority, have restrained the
> liberty of an individual. *Baker v. Commonwealth*, 5
> S.W.3d 142, 145 (Ky. 1999). The test is whether,
> considering the surrounding circumstances, a reasonable
> person would have believed he or she was free to leave.
> *Baker*, *supra*, citing *United States v. Mendenhall*, 446
> U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).
> Some of the factors that demonstrate a seizure or custody
> have occurred are the threatening presence of several
> officers, physical touching of the person, or use of a tone
> or language that might compel compliance with the
> request of the police. *Baker*.

*Commonwealth v. Lucas*, 195 S.W.3d 403, 405-06 (Ky. 2006).

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We agree with Cotton that the factors set forth in *Lucas*, *supra*, support the finding that Boerste was not in custody, as Boerste had not been detained or restrained when he was on top of his car, Cotton was the only officer present, Cotton was not touching Boerste, and Cotton's tone and language had not compelled Boerste's compliance. Therefore, we hold that Boerste was not in state custody or otherwise restrained by the state at the time of his injury.

Second, and similarly, Boerste cannot meet the second prong of the *Fryman-Ashby* test because a state actor did not commit the violence or offensive conduct. Rather, it was the tow truck driver, on whose tow truck Boerste's car sat, who drove off the campus with Boerste sitting on top of his car. Boerste did not cite any caselaw to support his argument that so long as a state actor is involved, the second prong of the test is met, and we decline to so hold.

Next, Boerste urges this Court to adopt the state-created danger exception to the duty requirement. The federal district court explained this doctrine, which it noted has been adopted by the Sixth Circuit, and how it applied in Boerste's federal action:

> The state-created-danger theory – an unwritten doctrine of so-called substantive due process – requires a plaintiff to show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff *would be exposed to an act of violence by a third party*; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the

state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright* [*v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)] (emphasis added).[4]

In *Cartwright*, for example, this theory failed for lack of an "affirmative act by the state." *Id.* Police officers found a man wandering intoxicated on a dangerous roadside. He voluntarily rode with them to someplace less dangerous: the parking lot of a convenience store. *Id.* at 489. The officers asked to pat him down before picking up a prisoner, but he refused and the officers left him at the lot. Later he was found dead in the road. His injury resulted from a third party – the driver whose truck struck him – consistent with the notion of a state-created danger. *Id.* But the estate's claim against the officers failed because those state actors didn't affirmatively increase the risk of that injury. *Id.* at 493.

. . . Boerste lacks evidence that any state actor exposed him to the "violence by a *third* party." *Cartwright*, 336 F.3d at 493 (emphasis added). The "doctrine does not apply where a state actor directly causes the plaintiff's asserted injury." *Rhodes v. Michigan*, 10 F.4th 665, 684 (6th Cir. 2021). To apply it here "would divorce the doctrine from its precedential roots." *Id.* (no state-created danger where two state actors directly caused

_____

[4] The Sixth Circuit has recognized this doctrine, but not every circuit has. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). A recent First Circuit decision counted at least nine circuits that had adopted some version of the doctrine and only one that had not. *Irish v. Fowler*, 979 F.3d 65, 73-74 (1st Cir. 2020). But at least one circuit continues to reject the doctrine. *See Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *see also Pinder v. Johnson*, 54 F.3d 1169, 1174-75 (4th Cir. 1995) (seemingly rejecting the doctrine); *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015) (seemingly recognizing but narrowing the doctrine). Among the approving circuits, the tests for liability are not uniform. *See* Christopher M. Eisenhauer, *Police Action and the State-Created Danger Doctrine: A Proposed Uniform Test*, 120 DICK. L. REV. 893, 898-908 (2016); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) (using four factors); *Hart v. Little Rock*, 432 F. 3d 801, 805 (8th Cir. 2005) (using five factors). [Footnote 5 in original].

injuries in a transportation accident). This species of constitutional liability holds a state actor "accountable for harms caused by some external force," but not for "injuries suffered as a direct result of state action," which might give rise to a different sort of claim. *Id*.

Boerste's theory of the case, by contrast, is and has long been that the tow-truck driver operated as a state actor when he drove off at the instruction of a police officer. When asked at argument to identify the non-state third party who inflicted his injury, Boerste named Bewley. But Boerste continued to maintain that Bewley was actually a state actor. And the basis on which Boerste sued Bewley and his employer for constitutional violations under § 1983 was clearly that Bewley acted for the state and harmed Boerste directly, not as a third party who inflicted harm based on a danger the government created or enhanced.

Bewley and Ellis (the towing company that employed Bewley) likewise agreed that they were state actors subject to liability under § 1983. Neither moved to dismiss or for summary judgment based on a lack of state action. The Court explicitly highlighted this question in its order for a hearing and at the hearing itself. [*S*]*ee* FED. R. CIV. P. 56(f) (requiring notice and an opportunity to respond). Yet Bewley and Ellis didn't dispute their status as state actors, contending instead that the evidence will prove at trial they are not liable either way. And Boerste agreed. So their status as state actors is undisputed. And if Cotton and Bewley are both state actors, no third party exists who could've harmed Boerste – meaning the state-created-danger claim necessarily fails. *See Rhodes*, 10 F.4th at 684. Certainly any such claim leveled against Bewley as a state actor would fail, because he couldn't have created or increased a danger visited by some other third party. No one else caused the harm, and Bewley cannot be a third party to himself.

Boerste's only remaining federal claim against Bewley, therefore, depends on a state-created danger, which cannot exist as a matter of law in the absence of harm inflicted by a third party. Given the lack of a third party here, the federal claims fall short against Cotton and Bewley alike.

*Boerste*, 607 F. Supp. 3d at 733-35 (citations to federal record and footnotes 6 and 7 omitted).

In *Hurst v. Caldwell*, No. 2015-CA-000786-MR, 2017 WL 128599, at *4 (Ky. App. Jan. 13, 2017),[5] this Court stated that the state-created danger exception has not been adopted in Kentucky. Even if this Court were to adopt the exception in this case – which we decline to do – Boerste's claim that the tow truck driver was a state actor precludes relief, because the state-created danger theory only applies to non-state actors.

For his next argument, Boerste contends that Cotton is not entitled to qualified official immunity on his negligence claims. We again disagree, and we have opted to review this argument as an alternate basis for our affirmance.

In *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001), the Supreme Court of Kentucky instructed that official immunity "is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions. It rests not on the status or title of the officer or

---

[5] This unpublished case is cited as persuasive authority pursuant to Kentucky Rules of Appellate Procedure (RAP) 41.

-17-

employee, but on the function performed." (Citing *Salyer v. Patrick*, 874 F.2d 374 (6th Cir. 1989).) Official immunity may be either absolute, when an officer or employee of the state or a governmental agency is sued in his or her representative capacity, or qualified, when the officer or employee is sued in his or her individual capacity. *Id.* at 521-22. And whether an officer or employee is protected by the doctrine of official qualified immunity is a question of law, subject to *de novo* review. *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citations omitted).

The *Yanero* Court explained that qualified official immunity "affords protection from damages liability for good faith judgment calls made in a legally uncertain environment" and "applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero*, 65 S.W.3d at 522 (internal citations omitted). But "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citing *Franklin County v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997)). And in *Marson v.*

*Thomason*, 438 S.W.3d 292, 302 (Ky. 2014), the Supreme Court of Kentucky

emphasized that:

> Immunity is reserved for those governmental acts that are not prescribed, but are done, such as policy-making or operational decisionmaking, without clear directive. The responsibility for such acts rests on the individual who has made a decision to act based on his judgment, without established routine, or someone else in the process to allow burden-shifting. For this reason, and to ensure that governmental officials will exercise discretion when needed, our law allows qualified immunity from suit on the performance of discretionary acts. This is a policy decision that has long been the law of the Commonwealth.

The Supreme Court further defined "discretionary acts" in *Haney v.*

*Monsky*, 311 S.W.3d 235, 240 (Ky. 2010), as follows:

> Discretionary acts are, generally speaking, "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." [*Yanero*] at 522 (*citing* 63C Am. Jur. 2d § 322). It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed. *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959).
>
> . . .

> [F]ew acts are ever purely discretionary or purely
> ministerial. Realizing this, our analysis looks for the
> *dominant* nature of the act. For this reason, this Court
> has observed that "an act is not necessarily taken out of
> the class styled 'ministerial' because the officer
> performing it is vested with *a discretion respecting the
> means or method to be employed*." *Upchurch*, 330
> S.W.2d at 430 (emphasis added).

(Footnote omitted.)

Boerste first argues that Cotton was performing a ministerial function in effectuating a safe arrest rather than a discretionary act when he negligently directed the tow truck driver to leave so that he could arrest Boerste off campus. In support of his argument, Boerste relies upon *Gonzalez v. Johnson*, 581 S.W.3d 529 (Ky. 2019), and *Pile v. City of Brandenburg*, 215 S.W.3d 36 (Ky. 2006), which both involved deaths of a third party caused by the operation of a motor vehicle (the deaths of third parties after being hit by an officer-driven police cruiser during a high-speed pursuit (*Gonzalez*) and by a prisoner who took control of and was driving a police cruiser (*Pile*)). We agree with Cotton that neither case supports Boerste's argument.

In *Gonzalez*, the third party was hit by an officer-driven police cruiser during a high-speed pursuit, and the issue involved the application of negligence law (the *per se* no proximate cause rule), not whether the officer was immune from liability. And while the Court in *Pile* addressed immunity (as well as the special relationship test) and held that "[t]he operation of a police cruiser is ministerial in

nature[,]" *id*. at 40, the factual circumstances were wholly different from the facts in the present case. In *Pile*, the police officer violated KRS 189.430 by failing to stop the engine, lock the ignition, and remove the key before he exited the cruiser. This allowed the handcuffed prisoner in the back seat to (somehow) gain control of the cruiser and drive away, causing the accident with the third party shortly thereafter. Here, Cotton was not driving or in control of the tow truck, and there was no statute that dictated how Cotton was to act in such a situation.[6]

We agree with Cotton that his actions were discretionary in nature, not ministerial, which entitles him to immunity. Cotton was exercising his discretion in investigating Boerste's possible intoxication and in deciding whether to arrest him. The federal district court provided an excellent analysis as to why his federal immunity argument failed:

> The more fundamental problem, however, is that driving is not the act that Boerste is really complaining about. He alleges "that Officer Cotton direct[ed] Bewley to drive off while [Boerste] was atop his car atop Bewley's tow truck," so Cotton could arrest Boerste on a public road (or, alternatively, that Cotton did not stop the tow). Nothing about those actions deal with driving itself. Rather, Cotton's actions reflect discretionary choices about whether and where to arrest or otherwise handle an inebriated individual surrounded by belligerent friends.

---

[6] We note that Boerste cites to KRS 189.125(6) to argue that permitting him (Boerste) to remain atop the car while the tow truck was in motion violated Kentucky law because he was not restrained.

> Such choices, even if far from perfect in hindsight,
> are classic exercises of discretion under federal law. . . .
> Cotton repeatedly asked Boerste to leave the roof of the
> car and call his father. Only after these attempts to
> induce compliance did Cotton (on Boerste's telling) ask
> Bewley to drive off so he could then arrest Boerste on a
> public road. Every choice in this progression required
> Cotton to exercise judgment between competing options.

*Boerste*, 607 F. Supp. 3d at 738-39. Because we hold that Cotton's actions were discretionary, Boerste failed to establish the first prong of the *Yanero* test.

Second, Boerste argues that Cotton acted in bad faith because he "took objectively unreasonable actions" when he directed the tow truck driver to drive onto a public road while Boerste remained on top of his car so that he could arrest him.

> [I]n the context of qualified official immunity, "bad
> faith" can be predicated on a violation of a constitutional,
> statutory, or other clearly established right which a
> person in the public employee's position presumptively
> would have known was afforded to a person in the
> plaintiff's position, *i.e.*, objective unreasonableness; or if
> the officer or employee willfully or maliciously intended
> to harm the plaintiff or acted with a corrupt motive. 63C
> Am.Jur.2d, *Public Officers and Employees*, § 333 (1997).
> Once the officer or employee has shown *prima facie* that
> the act was performed within the scope of his/her
> discretionary authority, the burden shifts to the plaintiff
> to establish by direct or circumstantial evidence that the
> discretionary act was not performed in good faith.

*Yanero*, 65 S.W.3d at 523.

While this is a closer call, we must agree with Cotton – and with what the court stated during the hearing – that there was no evidence of malicious intent on anyone's part. It was certainly Boerste's decision to climb atop his car and refuse to come down, and Cotton did not act maliciously or corruptly in permitting him to remain there. Cotton never touched him, restricted his movements, or harmed him, and Cotton tried, unsuccessfully, to convince Boerste to call his father, get off the car, and leave the scene. Accordingly, Boerste failed to establish that Cotton acted in bad faith, entitling Cotton to qualified official immunity if we had not held that Boerste failed to establish the duty element of his negligence claim.

We shall now address Boerste's negligent training and supervision claims against the City. To establish these direct claims, Boerste had to prove that:

> "(1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009) (citing *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. App. 1998)). Similarly, an employer may be held liable for negligent supervision if he or she knew or had reason to know of the risk that the employment created. *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291 (Ky. App. 2009).

*Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 32 (Ky. App. 2016). Boerste argues that "Cotton's failure to understand the basic concept of jurisdiction [he thought he

could only arrest Boerste on public property] is sufficient evidence for a jury to determine that Cotton was neither properly trained nor supervised." He states that there was no evidence in the record that Cotton understood the scope of his jurisdiction or that the City attempted to gauge his understanding, and he therefore urges this Court to hold that the absence of such proof creates a question of fact about the adequacy of Cotton's training and supervision.

Cotton, on the other hand, disputes Boerste's assertion that no evidence of supervision exists. Rather, Cotton points out that Boerste disregarded several pages of the City's expert's deposition testimony, in which he discussed the ways in which Cotton was supervised through reviews of his submitted reports and the supervisors' reliance upon citizen complaints (none were in Cotton's file) and commendations (which were in his file). We agree with Cotton that Boerste failed to produce any proof of negligent training and supervision to meet his burden, especially in light of Cotton's production of evidence. We also agree with Cotton that his mistake as to jurisdiction, by itself, is not evidence of the City's failure to train or supervise him as there were no other instances reflected in his records that mention this type of incident. *See Sloas*, 201 S.W.3d at 479 ("a single tragic incident involving jail personnel is not sufficient to establish a claim of inadequate training, and the duty of ordinary care to prevent harm arises only upon the discovery of some fact which would lead a reasonable person to believe there is

-24-

some likelihood of . . . injury." (Internal quotation marks, citations, and brackets omitted).)

We also reject Boerste's argument that the City is vicariously liable for Cotton's negligence. We have already held that Boerste failed to establish his negligence claim against Cotton, meaning that there can be no vicarious liability against the City. *See Carucci v. N. Kentucky Water Dist.*, 657 S.W.3d 924, 929 (Ky. App. 2022) ("such vicarious liability would depend on showing negligence on the employee's part.").

For his last argument regarding his claims against the City, Boerste asserts that CALGA does not provide any immunity defense for the City because it does not apply to ministerial acts. KRS 65.2003 provides in pertinent part as follows:

> Notwithstanding KRS 65.2001, a local government shall not be liable for injuries or losses resulting from:
>
> . . .
>
> (3) Any claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government, which shall include by example, but not be limited to:
>
> > . . .
>
> > (d) The exercise of discretion when in the face of competing demands, the local

> government determines whether and how to
> utilize or apply existing resources[.]
>
> . . .
>
> Nothing contained in this subsection shall be construed to
> exempt a local government from liability for negligence
> arising out of acts or omissions of its employees in
> carrying out their ministerial duties.

We have already held that Cotton's actions were discretionary in nature, not ministerial, and we agree with the City that training beyond the mandatory training set forth in KRS 15.334 and supervision are both discretionary. *See Haney*, 311 S.W.3d at 244 ("supervising the conduct of others is a duty often left to a large degree – and necessarily so – to the independent discretion and judgment of the individual supervisor.").

Finally, we shall address Boerste's IIED claims, which he argues survive even if his negligence claims do not and that he should be permitted to present them to a jury.

In *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984), the Supreme Court of Kentucky adopted the RESTATEMENT (SECOND) OF TORTS § 46, which defined the tort of Outrageous Conduct Causing Severe Emotional Distress as:

> (1) One who by extreme and outrageous conduct
> intentionally or recklessly causes severe emotional
> distress to another is subject to liability for such
> emotional distress, and if bodily harm to the other results
> from it, for such bodily harm.

However, in *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. App. 1993), the Supreme Court of Kentucky described this tort as a "gap-filler" only, not an alternate form of relief in cases such as Boerste's:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filler" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 recognizes that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action. The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

*See also Childers v. Geile*, 367 S.W.3d 576, 583 (Ky. 2012) ("There can be only one recovery for emotional distress on the same acts. It will either be caused as a result of an injury done to the plaintiff physically or it will be caused by outrageous conduct the purpose of which is to inflict emotional distress."). Here, Boerste was seeking to recover for emotional distress through his traditional tort claims. That Boerste was unsuccessful in his traditional tort claims against Cotton and the City does not entitle him to pursue alternate claims for IIED.

For the foregoing reasons, the summary judgment of the Washington Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Ann B. Oldfather
Michael R. Hasken
Benjamin F. Hachten
Louisville, Kentucky

BRIEF FOR APPELLEE MICHAEL
COTTON:

Stacey A. Blankenship
Kristen N. Krueger
Paducah, Kentucky

BRIEF FOR APPELLEES
SPRINGFIELD POLICE
DEPARTMENT AND CITY OF
SPRINGFIELD:

Matthew C. Hess
Elizabethtown, Kentucky